AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Plaintiffs,

v.

K. William O'CONNOR, Defendant.

NATIONAL TREASURY EMPLOYEES UNION, Plaintiff,

v.

K. William O'CONNOR, Defendant.

Civ. A. Nos. 84–0972, 84–0974.

United States District Court, District of Columbia.

June 29, 1984.

**1552**

Gregory O'Duden, Mitchell J. Notis, Washington, D.C., for plaintiffs.

Neil H. Koslowe, Sp. Litigation Counsel, Dept. Justice, Civil Div., Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Former section 9(a) of the Hatch Act, now found at 5 U.S.C. § 7324(a)(2) (1982), prohibits federal employees from taking "an active part in political management or political campaigns." Plaintiffs in these consolidated actions, two national labor unions of employees of the federal government, a union local, and the local's president, challenge the application of that prohibition to certain allegedly "non-partisan" voter registration and voter turnout campaigns they had planned to have their members conduct throughout this election year until they were warned by defendant that federal employees might be in violation of the Act by doing so. Defendant O'Connor is Special Counsel to the U.S. Merit Systems Protection Board ("MSPB"), charged with the investigation and prosecution of suspected violations of the Hatch Act before the MSPB, and the MSPB may suspend or dismiss federal employees found guilty of engaging in proscribed activities. 5 U.S.C. § 7325.

Plaintiffs pray that defendant's advisory legal opinion concerning the legality of their proposed activities, which he issued April 6, 1984, pursuant to 5 U.S.C. § 1206(*l*), in response to their query, be declared null and void. They say it misconstrues former section 9(a) of the Hatch Act, 5 U.S.C. § 7324(a)(2), and violates their rights under the First Amendment to the

Constitution. They ask the Court to order the opinion withdrawn and to enjoin defendant from seeking enforcement of the Hatch Act against federal employees who engage in the "non-partisan" voter registration and voter turnout drives the unions plan to sponsor. The matter is now before the Court on plaintiffs' applications for summary preliminary and permanent injunctive relief, and defendant's cross-motion for summary judgment of dismissal. The material facts as hereinafter set forth are not in dispute, and for the reasons stated the applications for injunctive relief will be denied and judgment entered for defendant.

## I.

In early March, 1984, one of defendant's staff attorneys wrote an advisory opinion letter in response to an inquiry by another union not involved here regarding the legality of the voter registration drives it intended to hold at government worksites. The letter stated the writer's opinion that federal employees "may participate in voter registration drives that are *not* identified with a political party or a partisan candidate for public office," but the Hatch Act prohibits their taking part in union-sponsored voter registration drives if the union itself has endorsed a partisan candidate for public office. Such an endorsement "identifies" the union with the candidate's success, he said, and the union thus becomes a "partisan club for the duration of the campaign." The staff attorney's letter quickly acquired notoriety within the federal workforce and independently prompted these plaintiffs to file separate actions in this Court to vindicate their own impending voter registration activities.

The complaint of American Federation of Government Employees ("AFGE"), one of its affiliated locals, and the local's president, alleges that the union has endorsed a candidate for the Democratic nomination for President in 1984; that it also encourages its locals to conduct "non-partisan" voter registration drives; and that the March letter, emanating as it did from the Office of the Special Counsel, threatens its federal-employee members with the loss of

their jobs if they participate. It sought an injunction prohibiting defendant "from enforcing or continuing in effect the holding of" the March letter.

The National Treasury Employees Union's ("NTEU") complaint alleges that it has endorsed partisan candidates for the presidency and the U.S. Senate and House of Representatives in 1984, and that it, too, desires to conduct "non-partisan" voter registration drives which the March letter inhibited by engendering fear on the part of members willing to help of "prosecution" for Hatch Act violations. NTEU asked for an injunction against defendant's "prosecuting plaintiff's members from [sic] engaging in nonpartisan voter registration and voter turnout activities."

Plaintiffs in both actions applied for temporary restraining orders. At hearing on March 30, 1984, the Court consolidated the actions with the consent of the parties but declined to issue a restraining order, because the staff attorney's letter did not purport to address, and, thus, did not raise a justiciable controversy with respect to, plaintiffs' own activities. *See French v. Devine*, 547 F.Supp. 443, 446–47 (D.D.C. 1982). On April 2, 1984, therefore, the unions joined to request their own advisory opinion from Special Counsel. They acknowledged endorsing partisan candidates for office in 1984, but gave assurance that, in their "non-partisan" voter registration activities, "no attempt is made to solicit registrants on the basis of political party or candidate preference."

Defendant issued his opinion on April 6th. After examining the history of the Hatch Act's prohibition of political activity by federal employees, he concluded that participation in a voter registration drive *may* constitute partisan activity within the meaning of the Act. Turning to the few facts before him with respect to plaintiffs' registration drives, and their representations that no partisan solicitation of prospective registrants would be made, the Special Counsel asserted that "the absence of such 'solicitation' at a voter registration booth does not necessarily mean that the

drive is not partisan; it is only one factor to be considered." Op. at 4. As to the candidate endorsements he said:

> By these endorsements the unions have become identified with the success of the endorsed candidates. If the voter registration drives are part of a campaign to enhance the electoral performance of your endorsed candidates, then employees may not participate because, under the Hatch Act, they "may not become prominently identified with any political movement, party or faction or with the success or failure of any candidate for election to public office." *Joseph S. Crawford,* 1 PAR 262, 263 (1946).

Some other relevant factors might include other political activities of the sponsoring organization, the degree to which that organization has become identified with the success or failure of a partisan political candidate, issue or party, the nexus, if any, between the decision to undertake a voter registration drive and the other political objectives of the sponsor, whether particular groups are targeted for registration on the basis of their perceived political preference and the nature of publicity circulated to targets of the drive immediately prior to or during the drive. This is, of course, only a partial list of factors we might consider in determining whether a voter registration drive is a partisan political activity and whether the participation of covered employees in such a drive would be in violation of the Hatch Act. Given the

increasing use of voter registration as a tool in partisan political campaigns, we cannot accept at face value your assertion that the drive you plan is "nonpartisan."

*Id.* at 5.

The Special Counsel observed that statements by national and local union officers (which plaintiffs do not repudiate) had stressed the important part played by these "non-partisan" voter registration drives in the unions' political strategies to elect partisan candidates whom they favored.[1]

The Special Counsel's opinion concluded:

> Where, as here, the unions have endorsed partisan candidates, and where, as here, the unions have issued public statements and communications to their membership emphasizing the importance of voter registration in advancing the campaigns of candidates which the unions support, the ineluctable conclusion must be that those voter registration drives sponsored or conducted by the unions are, in fact, partisan. Accordingly, we must advise you that participation by federal employees in your unions' voter registration drives is prohibited political activity within the definition of the Hatch Act.
>
> Of course, all federal employees, remain free to participate in truly nonpartisan registration drives.

*Id.* at 7.

Plaintiffs then renewed their applications for temporary restraining orders before

---

**1.** For example, a June, 1982, memorandum from the then-president of NTEU to various chapter presidents states in part:

> In the 1982 election, voter registration will play an important factor in the campaigns of many friends of government workers. Because of low voter turnout, many of our allies were defeated in 1980. Congressmen and Senators, who have stood by us in the past, are now emphasizing the critical need of registering those who are eligible to vote and then urging them to vote.
>
> By aiding in voter registration efforts, NTEU members can markedly increase our influence in the political process. I urge every NTEU Chapter to undertake a voter registration campaign at your workplace and/or in your community.

An excerpt from the *NTEU Bulletin,* dated January 30, 1984, reads:

> Under the Hatch Act, a federal employee can: Register people to vote. This is considered a non-partisan activity, but because pro-worker candidates rely on high voter turnout for victory, voter registration is an essential part of their campaigns.

And a statement dated February, 1984, attributed to the president of an AFGE local and circulated to his members, declared:

> AFGE National leadership was not surprised by President Reagan's announcement to run for and seek a second term. The battle lines are drawn, and it is time to speak out! One way to "speak-out" is to vote. If you are not a registered voter please contact any of our stewards, and we will assist you with voter registration in this area.

this Court which it again denied but scheduled an expedited hearing on the motion for a preliminary injunction and consolidated it with the hearing on the merits pursuant to Fed.R.Civ.P. 65(a)(2). NTEU and the Special Counsel moved for summary judgment.

Plaintiffs stress that at the drives they have planned there will be no hortatory solicitation of votes, and no political propaganda, paraphernalia, or campaign literature dispensed. All prospective voters will be duly registered without regard to party persuasion or candidate preference. The gist of their claim is that so long as these sterile conditions are observed at the registration site, their voter registration activities must be deemed "non-partisan" under the Hatch Act, and the fact that the national unions have endorsed particular candidates or taken partisan positions in public is irrelevant. They read Special Counsel's opinion to hold that national unions' endorsements of party candidates necessarily confers a partisan taint to any voter registration drive sponsored by union members or locals, a construction which, they say, improperly expands prohibitions of the Hatch Act. Furthermore, they argue, the Special Counsel's concept of partisanship is at variance with the use of the term in the Federal Election Campaign Act.

Plaintiffs also contend that the Special Counsel's opinion is fraught with numerous constitutional infirmities. Its construction of the Hatch Act abridges the free speech rights of both the unions and the individual members, and burdens the rights of the unions to associate freely with their members, and of the members to associate freely with one another. Because there is no compelling government interest in prohibiting nonpartisan political activity, they say, the opinion is invalid under the First Amendment. And they also assert that it is, on its face, overbroad (because it prohibits both partisan and nonpartisan political activity) and vague (because it does not draw clear distinctions as to what is prohibited and what is not).

The Special Counsel disputes the merits of each of plaintiffs' contentions, but he initially maintains that judicial review of his advisory opinion is not presently in order.

## II.

Defendant asks that the Court exercise its discretion to deny relief in these two cases, since the claims made, notwithstanding their putative First Amendment origins, should properly be heard and decided in the first instance by the MSPB in the context of an enforcement action, to be followed, if necessary, by review in a court of appeals, in accordance with the scheme envisioned by Congress for resolving such matters. Defendant points to no specific statutory provision which precludes pre-enforcement judicial intervention, but he contends that Congress' intent that the administrative process precede the judicial is implicit in the elaborate machinery which Congress has established to handle alleged Hatch Act violations. The process begins with the Special Counsel presenting a complaint detailing an alleged violation to the accused employee and the MSPB. 5 U.S.C. § 1206(g)(1). The employee then has a right to answer the complaint and present evidence to refute the charge, and he may be represented by an attorney in doing so. He also is entitled to a transcribed hearing before the MSPB or an administrative law judge, and must be given a written decision and the reasons therefor, including a copy of any final order imposing disciplinary action. 5 U.S.C. § 1207(a). If the employee becomes subject to a final order imposing disciplinary action, he may obtain judicial review in a court of appeals, 5 U.S.C. § 1207(c), which has the power to stay the order pending review. Fed.R.App.P. 18. This statutory process, insists defendant, evinces Congress' desire to develop, through the inherited and acquired wisdom of the MSPB, a uniform body of law interpreting the Hatch Act which militates against *ad hoc* pre-enforcement adjudications in district courts. Defendant further argues that review of his opinion at this time would be premature, because the advisory opinion is not a "final agency action" in all respects ripe for judicial review. Only an MSPB final decision meets that description.

Plaintiffs reply that this case falls without the rationale of any theoretical exhaustion-of-remedies requirement, because they are not seeking to circumvent an ongoing administrative process or to avoid initiating such a process themselves. They point out that the federal employees they represent are placed in the dilemma of acceding to the Special Counsel's opinion, giving up *ex terrorem* their rights of political speech and association, or risking almost certain enforcement action against them, with the distinct possibility of losing their jobs if they are wrong. Since the staff attorney in the Office of the Special Counsel issued the first advisory opinion plaintiffs have of caution abandoned all their plans for voter registration drives pending a decision by this Court. In such circumstances, they say, where important constitutional rights may be being irreparably harmed, the Special Counsel's advisory opinion is final enough agency action for the purpose of permitting them to go to court to test it.

These contentions, and the authorities the parties have cited to support them, invoke principles of both exhaustion of administrative remedies and ripeness (as well as ideas of finality, standing, and the existence of a justiciable case or controversy), in the abstract analytically distinct doctrines which in application often coincide with not altogether consistent results. *See, e.g., Abbott Laboratories v. Gardner*, 387 U.S. 136, 149–52, 87 S.Ct. 1507, 1515–17, 18 L.Ed.2d 681 (1967); *Toilet Goods Association v. Gardner*, 387 U.S. 158, 165–66, 87 S.Ct. 1520, 1525–26, 18 L.Ed.2d 697 (1967); *Gulf Oil Corp. v. United States Department of Energy*, 663 F.2d 296, 307 & n. 71, 310 (D.C.Cir.1981).[2]

Exhaustion of administrative remedies is often required before seeking relief in court for an actual or threatened injury. *See, e.g., Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938); *Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C.Cir.1984); *Athlone Industries v. CPSC*, 707 F.2d 1485, 1488 (D.C.Cir.1983). The requirement is not, however, generally treated as jurisdictional in nature but is to be applied in accordance with its purposes. *Andrade v. Lauer*, 729 F.2d at 1484. Exhaustion serves to discourage the flouting of agency authority and its processes; to enable the parties and the agency to develop the facts and produce a better record for review; to afford the agency opportunity to apply its expertise and to correct its own errors; and to promote judicial economy by preventing needless judicial factfinding or resort to the courts altogether if the agency functions to the satisfaction of all parties. *See Andrade v. Lauer*, 729 F.2d at 1484; *cf. Parisi v. Davidson*, 405 U.S. 34, 37–38, 92 S.Ct. 815, 817–19, 31 L.Ed.2d 17 (1972); *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969); *Athlone Industries v. CPSC*, 707 F.2d 1485, 1488 (D.C.Cir.1983); *Gulf Oil Corp. v. United States Department of Energy*, 663 F.2d 296, 309 (D.C.Cir.1981).

While each of those purposes might be served to some extent by awaiting the outcome of an MSPB enforcement proceeding here, as a practical matter these plaintiffs have no administrative remedies of their own to exhaust. They want to conduct their voter registrations now, yet Congress has provided them with no mechanism for administrative review of an advisory opinion of the Special Counsel.[3] All proceed-

---

**2.** "Both ripeness and exhaustion deal with timing of judicial review; the ripeness focus is on the types of functions that courts should perform, and the exhaustion focus is on the narrow question of how far a party must pursue an administrative remedy before going to court; the two often overlap." 4 K. Davis, Administrative Law Treatise § 25:1, at 350 (2d ed. 1983).

**3.** The contrast with an "unlawful personnel practice" case demonstrates the proposition. In such a case the putative illegal action has been taken by the government (or an employee's su-

periors acting in official capacities as agents of the government), and the employee pursues redress at the agency level. Since an aggrieved *employee* himself may seek administrative relief, the exhaustion requirement is imposed. *See, e.g., Andrade v. Lauer*, 729 F.2d at 1484–93; *Carducci v. Regan*, 714 F.2d 171, 175 (D.C.Cir. 1983). Here the situation is the reverse: any illegal conduct is engaged in by the employee and the government then seeks to punish. Before an employee engages in such conduct, however, there is nothing he can do to obtain administrative review of an advisory opinion of

ings before the MSPB under the Hatch Act are initiated by Special Counsel, and this he has neither done nor is obliged to do. The only way plaintiffs can obtain administrative consideration of their claims is to cause one or more of their federal-employee members to·engage in conduct which the Special Counsel has pronounced illegal and, thus, bait him into an enforcement action.

█ Once begun enforcement might so enhance the virtues of the exhaustion requirement as to preclude resort to the court·until it had finished. It could be said that a federal employee already in jeopardy is no worse off by being made to await the end of the MSPB proceedings. But it makes little sense here to fault the plaintiffs, or the federal employees they represent, for failing to do that which they cannot in fact do except by calling down upon the union members the punitive process for breaking a law they would prefer to obey if they can. Exhaustion is appropriate only when a complainant is realistically able to seek administrative relief simply by applying for it, or when the administrative process has already begun. When neither circumstance ·is present, as here, there still may be good reasons to question whether judicial review is proper, but those reasons are better considered in the context of ripeness, not·exhaustion.

Defendant contends that the Special Counsel's opinion is not final agency action ripe for judicial review, because the MSPB alone has authority to "hear, adjudicate, ... and ... take final action" on Hatch Act matters, 5 U.S.C. § 1205(a)(1), and it has neither ratified the advisory opinion, nor has it taken, or threatened to take, any action against plaintiffs' members. Review would be proper, says defendant, were plaintiffs challenging a final order of the MSPB, *see* 5 U.S.C. § 1207(c), or the issuance of a regulation by the Office of Personnel Management ("OPM") interpreting the Hatch Act, *see Joseph v. United States Civil Service Commission*, 554 F.2d

1140, 1149–52 (D.C.Cir.1977).[4] But the Special Counsel's opinion lacks the finality and "legal force" of either an OPM regulation or MSPB order, and, hence, is not ripe for review.

Neither of the two cases principally relied on by defendant, however, *W.E.B. DuBois Clubs v. Clark*, 389 U.S. 309, 88 S.Ct. 450, 19 L.Ed.2d 546 (1967) and *Dingess v. Hampton*, 305 F.Supp. 169 (D.D.C.1969) (three-judge court), persuade the Court that this dispute is presently unripe for decision. In *DuBois Clubs* the Attorney General petitioned the Subversive Activities Control Board ("SACB") for an order (thus initiating administrative proceedings comparable to a Hatch Act enforcement proceeding here) that the W.E.B. DuBois Clubs of America was a Communist-front organization and, as such, required by statute to register with the Attorney General. Before any administrative hearings could be held, however, the Clubs brought suit against the Attorney General to declare the Communist-front registration provisions unconstitutional and enjoin their enforcement. Affirming dismissal of the complaint the Supreme Court observed the availability of the administrative process in which the Clubs could raise their constitutional claims and "decline[d] to require the court below to permit substitution of an injunctive proceeding for the civil proceeding which Congress has specifically provided." *Id.* at 313, 88 S.Ct. at 453. But in *DuBois Clubs* the administrative process had commenced (to enforce, it should be noted, a statute attaching consequences to conduct that had already occurred) and a dispositive decision of some sort was inevitable if not imminent. *DuBois Clubs* does not purport to foreclose judicial review of pre-emptive agency rulings which anticipate and abort a contemplated exercise of rights as effectively as a final administrative adjudication.

---

the Special Counsel. Unions, of course, are not contemplated as proper parties to proceedings before the MSPB at all.

**4.** OPM assumed from the now-abolished Civil Service Commission the task of promulgating regulations under the Hatch Act. These regulations are codified at 5 C.F.R. Part 733.

*Dingess v. Hampton* followed the holding of *DuBois Clubs* in a Hatch Act case which defendant claims is directly on point. Plaintiff, an employee of a federally-funded county government program, alleged that he had been, and intended to continue to be, actively engaged in partisan politics in violation of the Hatch Act.[5] Asserting that he must either forego politics or face the loss of his job, he brought suit in this court to obtain a declaration that the application of the Hatch Act to him violated his constitutional rights and an injunction prohibiting the Civil Service Commission from enforcing it against him.[6] While the suit was pending the Commission's general counsel investigated Dingess' activities, concluding that he had not violated the Act and that no action would be taken against him. The court (McGowan, J.) dismissed the complaint, finding the situation "not unlike" that in *DuBois Clubs* where it had been argued that the "mere overhanging threat of an administrative proceeding, or the burden of going through with it once begun, has a chilling effect upon First Amendment freedoms of speech and association which vests a court with jurisdiction to intrude itself before the Congressional plan of proceeding is either invoked or has run its course." 305 F.Supp. at 173. The court said:

> We do not think the mere fact that a constitutional objection to an Act of Congress is derived from the First Amendment automatically and invariably means that a court must resolve the issue in advance, and without the benefit, of the

operation of the specific processes provided by Congress for the enforcement of the statute.

305 F.Supp. at 174.

*Dingess* is, however, distinguishable from the case at bar. The plaintiff in *Dingess* wanted to litigate whether the Hatch Act applied to him despite counsel's opinion that his activities were innocent and no action was to be taken against him.[7] In contrast plaintiffs here have been told by the official authorized to charge federal employees with violations of the Act that for their members to participate in their voter registration drives would be unlawful, and they have been given no reason to think that if they go ahead with them as planned he will change his mind about them or not do his duty as he now sees it. Given what appears to be the inevitability of the confrontation, any incentive to require union members to place their careers at hazard simply to learn if the Hatch Act applies as Special Counsel says it does is attenuated.

Indeed, more recent court challenges to the application of the Hatch Act have been permitted even though actual enforcement proceedings had not been completed, or even commenced.[8] In 1973, the Supreme Court decided the constitutionality of the Hatch Act's prohibition of certain political activity in a suit by plaintiffs who wished to engage in it and alleged that the Civil Service Commission "was enforcing, or threatening to enforce," its provisions against them, of whom only one had al-

---

**5.** The Hatch Act was made applicable to employees of state and local agencies paid with federal funds. *See Dingess,* 305 F.Supp. at 170.

**6.** Dingess would have incurred administrative prosecution virtually identical to that which takes place before the MSPB except that it would have been before the Civil Service Commission, the MSPB's predecessor agency in the enforcement of the Hatch Act.

**7.** The *Dingess* court also noted the irony of plaintiff's claims:

> Plaintiff's curious insistence that he has violated the Act no matter what the Commission says seems at odds with his allegations of the critical importance to him of his job. His

equally emphatic allegations that he proposes to go on violating the Act are also at apparent cross purposes with his argument founded upon the chilling effect of the Hatch Act. What is clear is that plaintiff disagrees with the policy considerations underlying the Congressional decision to extend the Hatch Act to the operations employees of the poverty program, and that he wants a nullification of that legislative judgment by the most expeditious means.

305 F.Supp. at 173 n. 5.

**8.** Another judge of this court reached the merits of a suit in a procedural posture identical to this case, and despite the defendant's express reliance on *Dingess. See French v. Devine,* 547 F.Supp. 443, 447–49 (D.D.C.1982).

ready violated the Act and none were yet the subjects of Commission proceedings. *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 551 & n. 3, 93 S.Ct. 2880, 2883 & n. 3, 37 L.Ed.2d 796 (1973).

Plaintiffs primarily rely on a Hatch Act decision of the court of appeals postdating *Dingess* in which the claims were held ripe for pre-enforcement review. *Joseph v. United States Civil Service Commission*, 554 F.2d 1140 (D.C.Cir.1977), involved a challenge to a Civil Service Commission regulation exempting participation in political campaigns as or on behalf of an independent candidate for an otherwise partisan election for local office in the District of Columbia from the strictures of the Hatch Act. The district court granted summary judgment in favor of the Commission, and on appeal the Commission argued both the merits and for dismissal because the case was not ripe for adjudication. Noting that "modern case law ... reflects a greater judicial willingness to aid litigants faced with the necessity of risking substantial harm in order to challenge the validity of government action," 554 F.2d at 1151, the court said, "[i]f this suit is dismissed, their only avenue for redress ... is to violate the Hatch Act and run the risk of losing their jobs." *Id.* at 1152.

■ Although there were reasons favoring judicial review in *Joseph* not presented here,[9] its holding is sufficient to dissuade the Court from following *Dingess* to dismiss the instant complaints on ripeness grounds. If, in a case like *Joseph*, review of the validity of a regulation is possible before it is enforced if its promulgation imposes "debilitating uncertainties" on the regulated parties,[10] so also should pre-enforcement review be available of a threat of enforcement which has the effect of deterring the exercise of constitutional rights. *See, e.g., Steffel v. Thompson*, 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974); *Andrade v. Lauer*, 729 F.2d 1475, 1483 (D.C.Cir.1984); *Kaplan v. Hess*, 694 F.2d 847, 850–51 (D.C.Cir.1982).

■ Special Counsel's advisory opinion here, even though lacking coercive legal effect, creates an onerous legal uncertainty and is tantamount to a threat of enforcement. It was issued, pursuant to a statutory grant of power, by the very person charged with initiating the enforcement process, and as an authoritative statement regarding the legality of these specific plaintiffs' planned conduct under the Hatch Act. It contemplated, and had the likely consequence of, "expected conformity," *see National Automatic Laundry and Cleaning Council*, 443 F.2d 689, 698 (D.C.Cir. 1971), and the history of plaintiffs' response to it attests to its practical effect in that regard. Plaintiffs are therefore entitled to seek review of it without further delay.

### III.

Plaintiffs' claims on the merits present three basic questions: whether Special Counsel's opinion is consistent with the Hatch Act; whether its construction of the Hatch Act is unconstitutional as applied to plaintiffs' activities; and whether the opinion is unconstitutional on its face. Before reaching those issues, however, the defend-

**9.** The principal plaintiff, a partisan candidate for office in the District of Columbia, was not a federal employee but was nonetheless aggrieved by the regulation because it allowed federal workers to assist his nonpartisan opponents. He would have been deprived of any forum in which to seek redress. Moreover, even a federal employee could not raise, in defense of a charge of engaging in clearly prohibited activity, the issue of the validity of an exemption from the Hatch Act of some other activity. 554 F.2d at 1550–51.

Other plaintiffs were elected members of the D.C. City Council who were members of the Republican or Democratic parties; federal employees who would have liked to campaign for partisan D.C. City Council candidates; and one who was interested in both obtaining federal employment and in campaigning for partisan candidates. The court found that all but the last person had standing to sue. *Id.* at 1145–49.

**10.** 4 K. Davis, Administrative Law Treatise § 25:16 at 411 (2d ed. 1983). *See Abbott Laboratories*, 387 U.S. at 152–53, 87 S.Ct. at 1517–18; *Andrade v. Lauer*, 729 F.2d at 1483; *Continental Air Lines, Inc. v. CAB*, 522 F.2d 107, 128 (D.C. Cir.1974).

ant urges the Court to undertake a more limited inquiry, viz., whether the opinion's construction of the Hatch Act is within the "outer limits" of certain rules incorporated by reference in the Hatch Act in 1940.[11] He argues that to the extent his advisory opinion falls within those limits, it must be accepted as an authoritative statement of the reach of the Hatch Act and upheld against First Amendment attack.

But in *Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Supreme Court held that the reach of the Hatch Act was *limited* by the 1940 rules, not that it was congruent with them, nor that the division between permissible and impermissible conduct would remain static. Indeed, by further regulations and adjudications within those bounds, the Civil Service Commission was to produce "a more refined definition of what conduct would or would not violate the statutory prohibition of taking an active part in political management and political campaigns." 413 U.S. at 575, 93 S.Ct. at 2895. To determine whether the Special Counsel's opinion properly construes the Act, therefore, the Court should proceed not by examining the law as it stood in 1940, but as it stands today.

Section 7324(a)(2) simply proscribes taking "an active part in political management or political campaigns." The Court in *Letter Carriers* reaffirmed the basic holding

of *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), that this prohibition, when limited to partisan political activity, is within Congress' constitutional power. The Court reiterated *Mitchell's* limiting construction:

> It was "only partisan political activity that is interdicted .... [Only] active participation in political management and political campaigns [is proscribed]. Expressions, public or private, on public affairs, personalities and matters of public interest, not an objective of party action, are unrestricted so long as the government employee does not direct his activities toward party success."

413 U.S. at 556, 93 S.Ct. at 2886 (quoting *Mitchell,* 330 U.S. at 100, 67 S.Ct. at 569).

But the available evidence in the statute and its history, the regulations, and prior administrative adjudications demonstrate no more than what all the parties concede—that *partisan* voter registration drives constitute prohibited activity under the Act—and leaves unanswered the central question here, namely, if the Special Counsel could (and properly did) find plaintiffs' voter registration drives so imbued with partisan character as to declare them off limits to federal employees. Partisanship, it appears, may be in the eye of the beholder,[12] but the Supreme Court's review of the purposes of the Hatch Act is of

---

**11.** Section 9(a) of the Act was passed in 1939. Pub.L. No. 76–252, § 9(a), 53 Stat. 1147, 1148. It prohibited, *inter alia,* employees of the executive branch of the federal government from taking "any active part in political management or in political campaigns," the prohibition now found in 5 U.S.C. § 7324(a)(2). A 1940 amendment, Pub.L. No. 76–753, § 4, 54 Stat. 767, 769, added to the Act § 15, stating that § 9(a) proscribed "the same activities on the part of such persons as the United States Civil Service Commission has heretofore determined are at the time this section takes effect prohibited on the part of [federal employees] by provisions of the civil-service rules prohibiting such employees from taking any active part in political management or in political campaigns." Those rules forbade, *inter alia,* "helping to get out the voters on registration and election days." United States Civil Service Commission Form 1236, Political Activity and Assessments, September

1939, § 20 (reprinted as an appendix to the opinion in *Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 586, 93 S.Ct. 2880, 2900, 37 L.Ed.2d 796.)

**12.** In *Clarence M. Fitzwilliam,* 1 PAR 77, 80 (1945), the Civil Service Commission rejected a defense that a drive was non-partisan: "A movement organized or unorganized, to get voters registered might be non-partisan; but this one was not." The employee charged with violating the Act had allowed his office to be used for a meeting to plan a voter registration drive. The Commission, in holding the subject of the meeting to be partisan, stressed that even though witnesses said that "there was no proposal to register Democrats in particular but 'just citizens generally,'" party leaders were heading the undertaking, and "party advantage seems to be clearly an object."

value in determining when it can be descried.

In the *Letter Carriers* case the Court noted that "the government has an interest in regulating the conduct and 'the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" 413 U.S. at 564, 93 S.Ct. at 2890 (quoting *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). Referring to the legislative history of the Act, the Court then explained the "obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act." 413 U.S. at 564, 93 S.Ct. at 2890. First was that federal employees should execute the laws impartially, "in accordance with the will of Congress, rather than in accordance with their own or the will of a political party." *Id.* at 564–65, 93 S.Ct. at 2890. To this was added the importance of appearing impartial, so as not to erode public confidence in the government. *Id.* at 565, 93 S.Ct. at 2890. A further major reason was to prevent federal workers from being employed to build a "powerful, invincible, and perhaps corrupt political machine." *Id.* The Hatch Act raised "substantial barriers ... against the party in power—or the party out of power, for that matter—using the thousands or hundreds of thousands of federal employees, paid for at public expense, to man its political structure and political campaigns." *Id.* at 565–66, 93 S.Ct. at 2890–91. Related to this was an effort "to further serve the goal that employment and advancement in the Government service not depend on political performance, and at the same time to make sure that Government employees would be free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." *Id.* at 566, 93 S.Ct. at 2891.

Tested by those purposes, the Special Counsel's analysis is entirely appropriate. To adopt plaintiffs' position—that their drives are necessarily non-partisan simply because prospective voters are registered without being importuned—would ignore the realities of modern political campaigning and revive the ancient specter of a civil service with debts to pay or collect.

Apart from public statements of the unions and their leaders, it is obvious that plaintiffs have partisan reasons for organizing and conducting their voter registration drives, even though they may not, at the instant of registration, openly court the vote. The very urgency with which they have pressed this litigation reveals the extent to which they envision voter registration as an integral part of their political strategies and not merely as a benevolent community service as, for example, a charity fundraiser or a Labor Day observance. And the extent to which the case has been treated as such by the Court (including its willingness to reach the merits when restraint might have been more prudent) is in direct proportion to importance claimed for it by plaintiffs as a First Amendment political right of the highest order.

The Court need not inquire into the efficacy of the drives in accomplishing their sponsors' goals. When advancement of a partisan cause is an object, the purposes of the Hatch Act are served by proscribing participation by federal employees. The partisan evils which voter registration drives may breed do not all occur at the registration table: civil servants may face subtle or overt pressure to assist in conducting those drives, not to mention registering for a certain party themselves and voting as the union would wish them to.

Plaintiffs' restricted definition of partisan activity—focusing as it does solely on how the registration itself is conducted—ignores a whole dimension of the Hatch Act. Participation in the drives may be proscribed, consistent with the purposes of the Hatch Act, not just because the ends of the activity are pernicious, but because the activity itself possesses such potential for pernicious political conduct. Unions of federal employees may be as entitled to take partisan political positions as other unions, and they may certainly conduct voter registration drives, but they cannot do both at

the same time if the twain are as closely related as they appear to be in this case. The Special Counsel's opinion does not broaden the Hatch Act beyond that which Congress intended. It is fully in harmony with it.

Plaintiffs make the further argument that, under the Federal Election Campaign Act of 1971, as amended, ("FECA") 2 U.S.C. §§ 431 *et seq.* (1982), and its implementing regulations, unions generically are allowed to engage in voter registration drives, which are generically tolerated as innocuous unless "assistance in registering or voting [is] withheld or refused on a partisan basis ...." 11 C.F.R. § 114.-3(c)(4) (1983). Be that as it may, the Court is not persuaded that the provisions of the FECA dictate a different interpretation of the Hatch Act.

■ That a labor union may, under FECA, engage in an activity says nothing about whether a federal employee may, under the Hatch Act, participate in the same activity sponsored by his or her union. The election statutes apply to all unions, whether or not they have federal workers as members, and the more specific provisions of the Hatch Act control over the more general provisions of FECA.[13] Furthermore, that an activity is not so "partisan" as to be proscribed by FECA or the regulations thereunder says nothing about its status under the Hatch Act. The two statutes were passed at different times, are directed at different afflictions of the electoral process, and have different purposes; there is no reason to conclude that they allow the same degree of "partisanship" in the political activities with which they are respectively concerned.[14]

Lacking any showing of congressional intent that the two statutes are to be construed together, the Court declines the invitation to do so on its own.

## IV.

Plaintiffs' penultimate argument is that Special Counsel's opinion, on its face, is fatally overbroad, reaching too far into areas of protected speech and associational rights. They point out that many of the elections in which their newly-registered voters will vote are without any partisan significance whatsoever. Moreover, they submit, although the national offices of the unions may have endorsed a particular candidate, union locals (or some of them at least) have not, and it is the locals which actually organize and conduct the drives, not the national headquarters. The assertion is belied, however, by plaintiffs' allegations that, because of Special Counsel's opinion, it is they—the national unions— which have had to stop planning for any future drives, training local officials in how to conduct them, and encouraging their national memberships to get involved. And the statements by or attributed to the national unions demonstrate the intimate nexus between the locals' voter registration drives and the national unions' political aspirations. If that nexus were refuted by a clear showing of autonomy on the part of a particular local's registration activities, then participation by federal employees might occur with impunity, assuming, of course, that the local itself remained uncommitted. Absent that showing, and in light of the unions' utterances of record before him, the Special Counsel's conclusion that the drives that these plaintiffs

---

**13.** Under FECA, unions are prohibited from making "a contribution or expenditure in connection with" a federal election, 2 U.S.C. § 441b(a); exempted, however, from the definition of "contribution or expenditure" are "communications" by a labor union to its members and their families on any subject. 2 U.S.C. § 441b(b)(2). One such form of "communication" with its members and their families in which unions in general may engage is "partisan" registration and get-out-the-vote drives, 11 C.F.R. § 114.3(c)(4) (1983), which, plaintiffs

concede, is plainly prohibited in the case of federal employee unions by the Hatch Act.

**14.** The purpose of the prohibition on union "contributions or expenditures," *see supra* n. 13, is to prevent union funds from being used to influence the public at large to vote for a certain candidate or party and to promote the responsibility of individual citizens for democratic government. *See, e.g., United States v. International Union United Auto Workers,* 352 U.S. 567, 570–84, 77 S.Ct. 529, 530–37, 1 L.Ed.2d 563 (1957).

intend to conduct are both partisan in nature and originate at union headquarters is not unfounded, whatever might be the evidence in some other case not yet presented to him.

■ Plaintiffs insist that the advisory opinion is also overbroad because a less sweeping rule—prohibiting coercion of union members as well as partisan solicitation of voters—would accomplish the purposes of the Hatch Act without forcing the unions to abandon either their political objectives or their registration drives altogether. But this very conclusion was rejected by the Court in the *Letter Carriers* case:

> It may be urged that prohibitions against coercion are sufficient protection; but for many years the joint judgment of the Executive and Congress has been that to protect the rights of federal employees with respect to their jobs and their political acts and beliefs it is not enough merely to forbid one employee to attempt to influence or coerce another. ... Perhaps Congress at some time will come to a different view of the realities of political life and Government service; but that is its current view of the matter, and we are not now in any position to dispute it. Nor, in our view, does the Constitution forbid it.

413 U.S. at 566–67, 93 S.Ct. at 2891 (footnote omitted). A broader prophylactic rule, which anticipates problems before they actually arise, is not permissible, even in a First Amendment context. *California v. LaRue,* 409 U.S. 109, 116, 93 S.Ct. 390, 396, 34 L.Ed.2d 342 (1972); *see also Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955); *Cutts v. Fowler,* 692 F.2d 138, 141 (D.C.Cir. 1982).

■ Plaintiffs contend, at the last, that the Special Counsel's opinion is unconstitutionally vague. They suggest that federal employees have no way of knowing what the Special Counsel regards as prohibited activity: his reasoning, if extrapolated, might anathematize a wide variety of activities conducted by any number of organizations to which a federal employee might belong. But the Special Counsel's opinion is, in large part, a product of plaintiffs' request. He confined himself to the facts before him and expressed no opinion regarding other hypothetical situations which might arise in the course of applying a statute as broad as the Hatch Act. At the same time, he could tailor his opinion only as narrowly as plaintiffs' request would allow. Because he was given few facts and was not advised of others—such as the purported autonomy of the locals—which might have permitted a narrower ruling, the problem is one of plaintiffs' making. Should they desire clarification, they are free to supply the Special Counsel with more information and ask him to elaborate.

For the foregoing reasons the Court finds that the advisory opinion of the Special Counsel does not contravene the Hatch Act and is not unconstitutional. Accordingly, it is, this 29th day of June, 1984,

ORDERED, that the motions of plaintiffs for summary judgment and for preliminary and permanent injunctive relief are denied; and it is

FURTHER ORDERED, that the motion of defendant for summary judgment is granted, and the complaints are dismissed with prejudice.