747 F.2d 748
 241 U.S.App.D.C. 311
 AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et
al., Appellants,
v.
K. William O'CONNOR, Special Counsel, Merit Systems
Protection Board.
NATIONAL TREASURY EMPLOYEES UNION, Appellant,
v.
K. William O'CONNOR, Special Counsel, Merit Systems Protection Board.
 Nos. 84-5410, 84-5414.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Aug. 31, 1984.
Decided Nov. 2, 1984.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action Nos. 84-00972, 84-00974).
 Gregory O'Duden, Washington, D.C., with whom Lois G. Williams, Washington, D.C., was on the brief, for appellant, Nat. Treasury Employees Union in No. 84-5414.
 Mitchell Jay Notis, Washington, D.C., with whom Mark D. Roth, Washington, D.C., was on the brief, for appellants, American Federation of Government Employees, AFL-CIO, et al. in No. 84-5410.
 Neil H. Koslowe, Sp. Litigation Counsel, Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Leonard Schaitman, Asst. Director, Dept. of Justice, Washington, D.C., were on the brief, for appellee in Nos. 84-5410 and 84-5414.
 John Vanderstar and Arthur B. Spitzer, Washington, D.C., were on the brief for amici curiae American Civil Liberties Union and Project Vote!, urging reversal.
 Before MIKVA, EDWARDS, and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 Concurring Statement filed by Circuit Judge EDWARDS.
 Dissenting Opinion filed by Circuit Judge MIKVA.
 GINSBURG, Circuit Judge:
 
 
 1
 The American Federation of Government Employees (AFGE) and the National Treasury Employees Union (NTEU) appeal a district court judgment declaring that an advisory opinion of K. William O'Connor, Special Counsel of the Merit Systems Protection Board (MSPB), "does not contravene the Hatch Act and is not unconstitutional." American Federation of Government Employees v. O'Connor, 589 F.Supp. 1551, 1563 (D.D.C.1984). The Special Counsel's advice concerns the permissibility under section 9(a) of the Hatch Act, 5 U.S.C. Sec. 7324(a)(2) (1982),[1] of voter registration drives conducted by members of public sector unions, after those unions have endorsed candidates for political office. AFGE and NTEU urge us to declare the Special Counsel's advisory opinion "illegal, void and contrary to law," AFGE Brief at 51; the government seeks affirmance of the district court's decision on the ground that the Special Counsel's advice "is reasonable and has a basis in fact." Government Brief at 26.
 
 
 2
 We hold that neither side is entitled to the disposition it seeks because the matter, as tendered to the district court and on appeal, is not ripe for judicial review. AFGE and NTEU have framed a general question not wedded to the facts of a particular case. They have named as sole defendant the MSPB's Special Counsel, an officer who may investigate, prosecute, and extend advice, but may not adjudicate Hatch Act liability. Adjudicatory authority in Hatch Act enforcement cases, at the administrative level, resides exclusively in the MSPB; that tribunal is not, in law or in practice, bound to follow the Special Counsel's advice. There is no indication at this time what position the MSPB would take on the question the unions pose.
 
 
 3
 Furthermore, the unions have barely sketched the contours of their case. They commenced this action without soliciting the Special Counsel's advice. Prompted by the district judge, the unions composed a terse inquiry to the Special Counsel, and received a return response formulated without investigation and with few hard facts in hand. The letter exchange between the unions and the Special Counsel presents unrefined issues in dim light. The unions' question, and the Special Counsel's answer, are not the stuff of a controversy ready for judicial review.
 
 
 4
 Because the district court reached out prematurely to declare law applicable to controversies lacking precise shape, we vacate the judgment from which the unions have appealed; we remand the case with instructions to dismiss the complaints for failure to present concrete claims ripe for court adjudication.
 
 I. BACKGROUND
 
 5
 This dispute centers on a letter opinion requested by the complaining parties and supplied by an officer who may investigate, prosecute, and advise, but whose advice binds no one. An earlier letter sparked the litigation. On February 29, 1984, James M. Peirce, president of the National Federation of Federal Employees (NFFE),[2] wrote John Erck, an attorney in the Office of the MSPB Special Counsel, to request written confirmation of an opinion Erck had expressed in a telephone conversation the day before. Erck had informed Peirce's aide that NFFE members could lawfully "conduct a nation-wide, non-partisan voter registration drive at their worksites," see NFFE Letter, reprinted in NTEU Joint Appendix (J.A.) 1a, as long as NFFE had not endorsed candidates for the upcoming presidential and congressional elections.
 
 
 6
 In a letter dated March 2, NTEU J.A. 4-5, Erck repeated this advice. He stated that, under the Hatch Act, "[f]ederal employees may participate in voter registration drives that are not identified with a political party or a partisan candidate for public office." However, he continued, "in our opinion," an organization's endorsement of a candidate would make it a "partisan club for the duration of the campaign." Erck's March 2 letter concluded:
 
 
 7
 Members of NFFE may participate in a voter registration drive as long as the organization maintains its neutrality. In the event that NFFE endorses a candidate for President and/or candidates for the U.S. Congress, NFFE members who are federal employees would be required to cease their voter registration activities.
 
 
 8
 Id.
 
 
 9
 On March 27, AFGE sued the Special Counsel;[3] NTEU filed its own complaint a day later. Neither union, at that stage, had itself requested advice from the Special Counsel, and neither ever named any other party defendant. The complaints principally alleged that because the AFGE and NTEU national unions had endorsed presidential and congressional candidates for the approaching elections, Erck's letter to NFFE had discouraged AFGE and NTEU members from engaging or continuing to engage in nonpartisan voter registration drives. Erck's advice to NFFE, AFGE and NTEU asserted, thus violated public sector union members' first amendment freedoms of speech and association. AFGE and NTEU sought (1) an injunction stopping the Special Counsel from "enforcing or continuing in effect" his subordinate's March 2 letter to NFFE, and (2) a declaration that the "holding" of the March 2 letter was contrary to the Hatch Act and unconstitutional. AFGE J.A. 11. On March 30, the district court denied the unions' motions for temporary restraining orders, AFGE J.A. 24-25, and instructed AFGE and NTEU to ask the Special Counsel for an opinion regarding the particular voter registration activities in which they wished to engage.[4]
 
 
 10
 The unions requested an advisory opinion from the Special Counsel on the following Monday, April 2. Their request letter contained a single paragraph describing the facts on which they sought advice:
 
 
 11
 [NTEU] and [AFGE] have each endorsed a candidate for the presidency in 1984. Both unions, as has been our practice in the past, are now engaged, through our locals and chapters, in nonpartisan voter registration activity at worksites across the country. More specifically, at such registration activities, no attempt is made to solicit registrants on the basis of political party or candidate preference.
 
 
 12
 NTEU J.A. 35. The letter supplied no further particulars about the ongoing or proposed voter registration efforts of the national or local unions. NTEU and AFGE closed by reminding the Special Counsel that the unions had "commenced litigation challenging the legality of [Erck's] March 2, 1984 letter," and that counsel for the Office of Special Counsel had furnished assurance "in open court ... that an opinion responding to our letter will be issued within the week." Id. at 36.
 
 
 13
 Four days later, on Friday, April 6, the Special Counsel addressed to counsel for NTEU and AFGE the advice letter on which the unions now center their plea for judicial review. In the opening paragraphs, the April 6 letter twice noted the "paucity of information" contained in the AFGE-NTEU letter of April 2. Also at the outset, the Special Counsel stated that his responsive letter was merely "advisory in nature," and that therefore "we have not conducted any investigation into your activity." Id. at 41.[5] The Special Counsel's letter next recounted some Hatch Act history and cited early Civil Service Commission adjudications establishing that voter registration drives could constitute prohibited political activity under certain circumstances. The Special Counsel then declared:
 
 
 14
 The determination of whether a voter registration drive is a political campaign activity must be made from the available evidence. Although you state that, "no attempt is made to solicit registrants on the basis of political party or candidate preference," the absence of such "solicitation" at a voter registration information booth does not necessarily mean that the drive is not partisan; it is only one factor to be considered.
 
 
 15
 Id. at 44. The Special Counsel went on to list a number of other factors his office might consider relevant to a determination whether a particular voter registration drive violated the Hatch Act.[6] He further stated: "This is, of course, only a partial list .... Given the increasing use of voter registration as a tool in partisan political campaigns, we cannot accept at face value your assertion that the drive you plan is 'nonpartisan.' " Id. at 45.
 
 
 16
 At this point, the tenor of the letter changed. In place of comment on the few operative facts before the Special Counsel, and generalized, noncommittal, or tentative observations, the advice became: "The material available to us indicates that your voter registration drives have become adjuncts to the political campaign activities of your unions." Id. at 46. Citing communiques from leaders of the national unions and their locals that "emphasiz[ed] the importance of voter registration in advancing the campaigns of candidates which the unions support," the Special Counsel stated:
 
 
 17
 [T]he ineluctable conclusion must be that those voter registration drives sponsored or conducted by the unions are, in fact, partisan. Accordingly, we must advise you that participation by federal employees in your unions' voter registration drives is prohibited political activity within the definition of the Hatch Act.
 
 
 18
 Id. at 47. "Of course," the Special Counsel added, "all federal employees[ ] remain free to participate in truly nonpartisan registration drives." Id.
 
 
 19
 AFGE and NTEU amended and renewed their requests for relief. After full argument and briefing, the district court issued its decision on June 29. The court first addressed questions of justiciability. No exhaustion-of-administrative-remedies barrier impeded immediate court adjudication, the district judge held, because there is no review track within the agency for advice the Special Counsel gives.[7] Turning to the ripeness of the unions' case, the court stated that although the Special Counsel's opinion "lack[ed] coercive legal effect," it "create[d] an onerous legal uncertainty" and was "tantamount to a threat of enforcement." O'Connor, 589 F.Supp. at 1559. In view of the severe penalties attending an MSPB adjudication that a federal employee has violated the Hatch Act--dismissal or, at a minimum, suspension without pay for thirty days, id. at 1552 (citing 5 U.S.C. Sec. 7325 (1982))[8]--the district court concluded that the Special Counsel's advice in fact impels conformity. Id. at 1559. The court therefore held the unions "entitled to seek review of [the advice] without further delay." Id.
 
 
 20
 On the merits, however, the court found the Special Counsel's advisory opinion both consistent with the Hatch Act and constitutional. Id. at 1563. AFGE and NTEU defend the district court's ruling on ripeness and urge reversal of the decision on the merits.
 
 II. DISCUSSION
 
 21
 In their initial briefs, the unions and the government grappled almost exclusively with the broad first amendment question presented to and decided by the district court. At oral argument we inquired into the ripeness of the case for judicial review, see Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and we subsequently allowed both sides to submit supplemental briefs addressed to that threshold matter.[9] We raised the ripeness issue on our own motion because it "involve[s], at least in part," Regional Rail Reorganization Act Cases, 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974), the limits article III places on judicial power. See generally G. GUNTHER, CASES AND MATERIALS ON CONSTITUTIONAL LAW 1655-66 (10th ed. 1980). Mindful of those limits, we conclude that two prime facets of the AFGE and NTEU complaints render the case the unions have framed unsuitable for court adjudication, see Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515: (1) the character of the administrative action AFGE and NTEU challenge; (2) the sweeping generality of the case the unions have chosen to state.
 
 A.
 
 22
 AFGE and NTEU solicited advice from the MSPB's Special Counsel, and now seek a judicial declaration that the advice they obtained is void. In effect, the unions would have article III judges rewrite the Special Counsel's advisory opinion. But the advice the Special Counsel is permitted to give creates no law and binds neither the public nor any agency or officer of government. No precedent known to us sanctions court review of such nonbinding advisory expositions.[10]
 
 
 23
 To clarify the position of the Special Counsel in relation to Hatch Act enforcement, we describe Congress' three-way division in 1978 of the authority once vested entirely in the Civil Service Commission (CSC).[11] Under the Civil Service Reform Act of 1978, Pub.L. No. 95-454, 92 Stat. 1111, the MSPB is charged with adjudicating Hatch Act cases,[12] the Office of Personnel Management (OPM) is responsible for promulgating Hatch Act regulations,[13] and the Office of the Special Counsel is empowered to investigate allegations of Hatch Act violations and to present them to the MSPB.[14] In line with contemporary separation-of-powers and due process jurisprudence, see, e.g., M. MCCLINTOK, NLRB GENERAL COUNSEL 14-15 (1980), the prosecutorial and adjudicatory arms of the statutory scheme work independently;[15] the MSPB is free to disagree with the Special Counsel and often does. See, e.g., Special Counsel v. Biggs, 1983 FED.MERIT SYS.REP. (LAB.REL.PRESS ) p 5238 (Aug. 23, 1983); see also Developments in the Law--Public Employment, 97 HARV.L.REV. 1611, 1643 (1984) (Office of the Special Counsel's "seemingly broad powers are greatly circumscribed in practice, [in part] by the Special Counsel's lack of authority to require either the Board or other agencies to do its bidding") [hereafter cited as Developments ].[16]
 
 
 24
 When Congress positions an agency to speak the final administrative word on the meaning of a statute, and that agency talks, judicial review of the pronouncement may well be in order. See, e.g., Joseph v. United States Civil Service Commission, 554 F.2d 1140 (D.C.Cir.1977); Continental Air Lines v. Civil Aeronautics Board, 522 F.2d 107 (D.C.Cir.1975) (en banc); National Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689 (D.C.Cir.1971); National Student Association v. Hershey, 412 F.2d 1103 (D.C.Cir.1969).[17] Here, in contrast, we have only the advice of an officer Congress did not authorize to speak definitively. The Special Counsel neither represents the views of the MSPB nor holds sway over it; his advisory opinions offer essentially a forecast, albeit an educated one, of the way the MSPB would rule if an actual case materialized.[18] Like the advisory letters and opinions offered in diverse government quarters, see Automatic Laundry, 443 F.2d at 699-700 & n. 10, such counsel "can serve the [salutary] purpose of providing an informed though not binding prediction," but "[t]here are sound reasons why [the advice] should not be subject to judicial review." Id. at 699.[19]
 
 
 25
 One salient, practical reason is the inhibitive effect judicial review might have on the performance of a valuable public service. We note that in 1983, the Office of the Special Counsel issued some 4000 informal advisory opinions concerning the Hatch Act. See Developments, supra p. 753, at 1654 (citing OFFICE OF THE SPECIAL COUNSEL, U.S. MERIT SYS. PROTECTION BD., A REPORT TO CONGRESS FROM THE OFFICE OF SPECIAL COUNSEL: FISCAL YEAR 1983, at 16-17 (1983) [hereafter cited as REPORT]. If every such opinion that displeased the party requesting it could be attacked in court, the Special Counsel might hesitate to devote the limited resources of his office to this work.[20]
 
 
 26
 The Special Counsel's authority to issue advisory opinions regarding the Hatch Act derives from 5 U.S.C. Sec. 1206(l ) (1982), which apparently codifies past csc practice under pre-1978 civil service law. See United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 580 & n. 22, 93 S.Ct. 2880, 2898 & n. 22, 37 L.Ed.2d 796 (1973). In reaffirming the constitutionality of the text of the Hatch Act, the Supreme Court specially commended this mechanism for dispensing informal advice; the Court believed that the availability of a preliminary opinion in advance of employee action would alleviate the Act's potential to chill the exercise of first amendment rights. Id. But if the Special Counsel could be haled into court every time there was heard a discouraging word from his office, the giving of needed advice would perforce be hampered and might well be paralyzed. Absent some indication that the Special Counsel has metamorphosed from a counselor and constructor of safe harbors into a determined censor of government employees' political activities, judges should not jeopardize a process that the High Court has identified as a saving grace of Hatch Act administration.
 
 
 27
 The prospect that our routine surveillance would hobble the Special Counsel in his role as a counselor bears on a larger concern: judicial review of the Special Counsel's advice, we believe, would be discordant with the congressionally established scheme for deciding Hatch Act cases. Court oversight of the Special Counsel's opinions would either short-circuit that scheme or introduce a most peculiar doubling of judicial effort.
 
 
 28
 Congress has installed the MSPB as the administrative forum of first resort in the adjudication of Hatch Act enforcement cases and--at the MSPB's option or the Special Counsel's request--in the review of Hatch Act regulations promulgated by the OPM. See 5 U.S.C. Sec. 1205(e) (1982). The MSPB has thus inherited the CSC's "accustomed role" of refining the law of prohibited political activities through the continual decision of cases and the coordination of the rules that emerge from them; the process of applying administrative experience and expertise to the ever-varying fact patterns in this constitutionally delicate field is one "that Congress necessarily anticipated would occur down through the years." Letter Carriers, 413 U.S. at 574-75, 93 S.Ct. at 2895.
 
 
 29
 Were we to allow parties discontent with the Special Counsel's advice to proceed directly to court, bypassing the MSPB altogether, we would strip the MSPB of the authority Congress allocated to that body as tribunal of first instance.[21] The government proposed a solution to this particular problem. It suggested that we adopt a relaxed standard of review and simply inquire whether the Special Counsel's advice was "reasonable and ha[d] a basis in fact." Government Brief at 26. Were we to follow that path, we would become engaged in the construction of initial court rulings of little practical import and with scant precedential impact upon the MSPB; we would involve judges in a progression from tentative preview of Special Counsel opinions to dispositive review of MSPB decisions. If this sort of yo-yo review has antecedents in federal practice, we are unfamiliar with them; nor are we aware of any warrant from Congress to create such a curiosity.[22]
 
 B.
 
 30
 Even if the Special Counsel could dictate to the MSPB in Hatch Act matters, we would question the fitness for review of the unions' case.[23] As a commentator not unfriendly to preenforcement judicial review reminds us:
 
 
 31
 No court should decide an issue that has not been properly clarified and no court should decide any question without needed facts. A case is clearly unripe for judicial determination if issues are unclear or needed facts are undeveloped.
 
 
 32
 K. DAVIS, ADMINISTRATIVE LAW TREATISE Sec. 25:11, at 385 (2d ed. 1983).
 
 
 33
 Courts customarily deal in specific facts or circumstances drawn with some precision and legal questions trimmed to fit those facts or circumstances; they are not in the business of deciding the general without reference to the specific. See Toilet Goods Association v. Gardner, 387 U.S. 158, 162-64, 87 S.Ct. 1520, 1523-24, 18 L.Ed.2d 697 (1967); Andrade v. Lauer, 729 F.2d 1475, 1481 (D.C.Cir.1984).[24] AFGE and NTEU, however, tendered no fact-particular case to or against the Special Counsel. Instead, the unions solicited an assurance that their registration activities, broadly and briefly described, would be given carte blanche as long as participants made "no attempt ... to solicit registrants on the basis of political party or candidate preference." NTEU J.A. 35. The Special Counsel denied the unions the general license they sought, but that action in itself presents no crystallized controversy.[25] In short, the case proffered by AFGE and NTEU against the Special Counsel contains a broadside, but no precise fact accounting on the unions' side; no "reflective examination in the course of [any] agency's interpretative process"; and none of the "signposts of authoritative determination, finality and ripeness" that have pointed us in other cases toward judicial review.[26] See Automatic Laundry, 443 F.2d at 702.
 
 
 34
 At oral argument, AFGE suggested that a two-letter exchange in the record[27] indicated the specificity and maturity of this case. The first letter, dated March 26, 1984, is a request from an AFGE local in San Antonio, Texas, for permission to conduct a worksite voter registration drive. The second is a response from the employing unit (a Veterans Administration hospital) in San Antonio, dated March 27, 1984; the response relies on the Special Counsel's "ruling" (apparently, the March 2 letter to NFFE) to deny the request.
 
 
 35
 We express no view on the current justiciability of the suggested San Antonio case. Plainly, it is not the one before us. Neither the San Antonio local[28] nor the employing unit is a party to this action. Moreover, the Special Counsel was never asked to, and did not in fact, explore any questions concerning the independence of local unions from their parent organizations; such questions might well prove central to the Special Counsel's conclusions about the effect of the national unions' endorsements on voter registration activities in a given case. It was the district court's view, we note, that if a local could make a "clear showing" of autonomy, "then participation [in registration drives] might occur with impunity, assuming, of course, that the local itself remained uncommitted." O'Connor, 589 F.Supp. at 1562. But the AFGE-NTEU letter request advanced no claim of that character. The letter identified broadly and only the registration drives that the national unions had conducted in the past "through [their] locals and chapters." See supra p. 751.
 
 
 36
 The Special Counsel has confronted no AFGE or NTEU member with a prosecution threat should he or she participate in a particular voter registration drive. Indeed, the fact-thin quality of the case AFGE and NTEU have stated precludes a court from holding, with fidelity to Supreme Court precedent, that "a genuine threat of enforcement" has been demonstrated here. Cf. Steffel v. Thompson, 415 U.S. 452, 455-56 & n. 4, 459, 94 S.Ct. 1209, 1213-14 & n. 4, 1215, 39 L.Ed.2d 505 (1974) (two threats of arrest; companion actually arrested; prosecution likely); id. at 476, 94 S.Ct. at 1224 (Stewart, J., concurring) ("genuine threat" cases will be "exceedingly rare"); Kaplan v. Hess, 694 F.2d 847 (D.C.Cir.1982) (threat by judge, the ultimate decisionmaker, to jail for contempt). It is of some significance in this regard that in 1983, in addition to issuing "roughly 4,000 informal advisory opinions regarding the Hatch Act," the Special Counsel "received 86 allegations of violations, and initiated two prosecutions." Developments, supra p. 753, at 1654 (citing REPORT, supra p. 754, at 16-17). Since the creation of his office in 1978, the Special Counsel has never initiated more than thirteen Hatch Act prosecutions in a single year. Id. at 1654 n. 25 (citing REPORT, supra p. 754, at 17). And given the "political, budgetary, and staffing problems that have plagued the Office since its inception," id. at 1643-44, the number of prosecutions seems unlikely to increase markedly in the near future.[29] See also supra note 8.
 
 CONCLUSION
 
 37
 Our rejection of the instant action on ripeness grounds is without prejudice to the unions' rights to pursue any other remedies they may have. AFGE and NTEU or their locals may wish, for example, to formulate further, more detailed requests for advice; on a fuller statement of facts, and with more time for consideration, the Special Counsel may well reach other conclusions.[30] Moreover, although the 1984 elections will soon be history, the unions may seek to prevent a recurrence of their present problems by requesting an OPM rulemaking--ultimately reviewable in court, see Joseph v. United States Civil Service Commission, 554 F.2d 1140 (D.C.Cir.1977)--on voter registration drives.[31] Finally, we leave for another day and case the question whether federal employees and their unions may proceed against an employing unit for refusing a request to conduct a worksite voter registration drive.
 
 
 38
 The judgment of the district court is vacated[32] and the case is remanded with instructions to dismiss the unions' complaints for failure to present claims currently ripe for court adjudication.
 
 
 39
 It is so ordered.
 
 EDWARDS, Circuit Judge, concurring:
 
 40
 This case is complicated because of the posture in which it comes before us. The appellants seek to challenge an advisory opinion issued by the Special Counsel, an official charged solely with authority to prosecute cases before the Merit Systems Protection Board ("MSPB"). Under these circumstances, I view the suit as a nonjusticiable action against a prosecutorial official. In addition, I regard the case as unripe for adjudication for the reasons stated in Part II.B of Judge Ginsburg's opinion. I therefore join the opinion of the court.
 
 
 41
 I wish to disassociate myself, however, from any possible suggestion that all cases that implicate the Hatch Act are within the exclusive jurisdiction of the MSPB. As I read the statute, the MSPB's authority with regard to the Hatch Act is limited to adjudicating alleged violations, reviewing regulations issued by the Office of Personnel Management, and performing certain related tasks. See 5 U.S.C. Sec. 1205(a), (e) (1982).
 
 
 42
 Therefore, I do not believe the role of the MSPB in Hatch Act enforcement cases would pose any obstacle to federal court adjudication of cases that might implicate the Hatch Act in other ways. I think it clear, for example, that a declaratory relief action by federal employees or unions, challenging the denial of permission by a federal employer agency to use its facilities for voter registration, would not be barred on the ground that it would circumvent the jurisdiction of the MSPB. Congress has assigned the MSPB jurisdiction to determine Hatch Act violations; that grant of jurisdiction does not stand as a barrier to normal adjudication of otherwise properly presented constitutional or statutory claims.
 
 MIKVA, Circuit Judge, dissenting:
 
 43
 The American Federation of Government Employees and the National Treasury Employees Union wish to register citizens to vote. The Special Counsel of the Merit Systems Protection Board, who is responsible for bringing charges under the Hatch Act, has advised the unions unequivocally that the Act prohibits federal employees from participating in drives the unions sponsor, no matter how neutrally the drives are conducted. The court today finds no controversy between the unions and the Special Counsel ripe for adjudication; I disagree.
 
 
 44
 * I start from the assumption that, as a general matter, federal courts should be available to adjudicate concrete disputes involving federal law. For a variety of reasons, we at times find it necessary or appropriate to refrain from resolving cases brought before us, but I think the public pays us mainly to settle controversies, not to avoid them. Before refusing to hear a case within our jurisdiction, we should therefore consider the costs of our refusal to the parties and the public with at least as much sensitivity as we bring to our assessment of the benefits.
 
 
 45
 This is especially true when, as today, the court's concern is ripeness. The Supreme Court has instructed that whether a case is ripe is a "flexible" matter that depends on "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149-50, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967). Accordingly, we have taken a pragmatic, balancing approach to the constitutional as well as the prudential component of ripeness. See Andrade v. Lauer, 729 F.2d 1475, 1480 (D.C.Cir.1984); National Student Association v. Hershey, 412 F.2d 1103, 1115 (D.C.Cir.1969). What I find most distressing about today's decision is that, in sharp contrast to the majority's extensive analysis of the drawbacks to adjudicating the case before us, the court limits its discussion of the hardship likely to be caused by its restraint to a remarkable suggestion that the Special Counsel's opinion carries no serious threat of enforcement and a passing recommendation that the unions seek relief from the Office of Personnel Management or from Congress.
 
 
 46
 The majority dismisses far too quickly the appellants' interest in a prompt adjudication of their dispute with the Special Counsel. The practical consequence of today's decision is that, unless federal workers are willing to put their jobs on the line, the Special Counsel's construction of the Hatch Act will remain the law: employees throughout the nation will effectively be barred from participation in neutrally conducted voter registration drives sponsored by AFGE or NTEU. The minimum penalty for violation of the Hatch Act is thirty days' suspension without pay, and outright dismissal is required in all cases in which the Merit Systems Protection Board does not vote unanimously for a lesser sanction. See 5 U.S.C. Sec. 7325 (1982). No matter how infrequently the Special Counsel has brought Hatch Act charges in the past, federal employees can hardly be faulted for concluding that registering voters in flagrant disregard of the Special Counsel's advice is not worth the grave risk to their livelihoods. Indeed, coerced compliance of this sort may well explain why to date the Special Counsel has rarely found it necessary to initiate enforcement actions.
 
 
 47
 As the district court recognized, declaratory relief has long been available to alleviate precisely such "debilitating uncertainties about governmental requirements imposed on private parties." 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE Sec. 25:16, at 411 (2d ed. 1983). Much of the point behind the Federal Declaratory Judgment Act, 28 U.S.C. Secs. 2201-2202 (1982), is "to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships." Aetna Casualty & Surety Co. v. Quarles, 92 F.2d 321, 325 (4th Cir.1937) (Parker, J.). Moreover, we have noted that "modern case law ... reflects a greater judicial willingness to aid litigants faced with the necessity of risking substantial harm in order to challenge the validity of governmental action," and that, in particular, employees who wish to challenge administrative implementation of the Hatch Act should not be forced to jeopardize their jobs. Joseph v. United States Civil Service Commission, 554 F.2d 1140, 1149-52 (D.C.Cir.1977).
 
 
 48
 Although Joseph involved a challenge to regulations, we should be no more grudging about relieving uncertainties imposed by credible threats of enforcement, particularly when the threats may chill the exercise of first amendment rights. This is the unambiguous teaching of Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), where the Supreme Court held that a leafletter faced with a genuine threat of criminal charges need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." Id. at 459, 94 S.Ct. 1215. We have recognized that the principle underlying Steffel extends to threats of sanctions other than criminal prosecution. See Kaplan v. Hess, 694 F.2d 847, 851 (D.C.Cir.1982).
 
 
 49
 The majority depicts the Special Counsel's opinion as too general and tentative to constitute a credible threat of enforcement or to present a "crystallized controversy." Maj. op. at 755-757. But no matter how many factors the Special Counsel indicated might be relevant in some situations to determining whether a voter registration drive was partisan, his evaluation of the drives sponsored by AFGE and NTEU was anything but tentative:
 
 
 50
 Where, as here, the unions have endorsed partisan candidates, and where, as here, the unions have issued public statements and communications to their membership emphasizing the importance of voter registration in advancing the campaigns of candidates which the unions support, the ineluctable conclusion must be that those voter registration drives sponsored or conducted by the unions are, in fact, partisan. Accordingly, we must advise you that participation by federal employees in your unions' voter registration drives is prohibited political activity within the definition of the Hatch Act.
 
 
 51
 Letter from K. William O'Connor to Lois Williams and Mark Roth at 7 (Apr. 6, 1984), AFGE J.A. at 34, NTEU J.A. at 47. As the district court recognized, an advisory opinion of such specificity, issued by the official statutorily charged with initiating punitive proceedings under the Hatch Act, is clearly tantamount to a threat of enforcement. The majority's assertion to the contrary is hard to fathom.
 
 II
 
 52
 Almost as puzzling as the court's peculiar insensitivity to the first amendment interests of federal employees is its exaggerated solicitude for the administrative difficulties our resolution of this controversy might cause. I cannot understand, for example, why fear of litigation would lead the Office of the Special Counsel to keep its views to itself until after a violation of the Hatch Act has occurred, at which point there obviously is no possibility for the Office to vindicate its position without resort to adversary proceedings. Even harder for me to grasp is how the Special Counsel could reasonably fear being haled into court for issuing an advisory opinion that condoned proposed activity--the kind of opinion valued so highly by the Supreme Court and the majority for its role in alleviating coercive uncertainties under the Act. See maj. op. at 754. More mysterious still is why the court so readily discerns the possibility that aversion to litigation will silence the Special Counsel in this way, but not the possibility that the Special Counsel will bring charges against those who disregard his advice, or the possibility that employees might reasonably fear such charges.
 
 
 53
 Similarly exaggerated is the court's concern not to "short-circuit" the "congressionally established scheme for deciding Hatch Act cases." Maj. op. at 754-755. Congress has indeed made the Merit Systems Protection Board "the administrative forum of first resort" for adjudication of certain Hatch Act disputes: those initiated by the Special Counsel rather than by employees. As Judge Edwards points out, however, this statutory grant of authority hardly constitutes a legislative command that courts refrain from considering any Hatch Act controversies before the Board has had its say. At a minimum, it should take a much clearer statement of congressional intent to so circumscribe the historic role of federal courts in protecting federal rights. Cf. Borrell v. United States International Communication Agency, 682 F.2d 981, 989 (D.C.Cir.1982).
 
 
 54
 As the Supreme Court recognized in Steffel v. Thompson, moreover, the federal courts do not disrupt or circumvent an independent adjudicative system when they resolve matters within their province before proceedings even commence in the other forum, particularly when those proceedings cannot be initiated by the party seeking federal relief. In Steffel, the Court concluded that general principles prohibiting federal courts from interfering with state criminal proceedings do not apply when a declaratory judgment is sought before state proceedings are commenced. To hold otherwise, the Court noted, might "place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." 415 U.S. at 462, 94 S.Ct. at 1217. Surely the interest of federal employees in avoiding a similar dilemma warrants flexibility in our application of whatever silent directives we infer from Congress' grant of jurisdiction to the Merit Systems Protection Board.
 
 III
 
 55
 The practical implications of today's decision for the first amendment rights of federal employees can perhaps best be appreciated by considering the situation of AFGE Local 3511, which represents workers at the Veterans Administration hospital in San Antonio. In the past, Local 3511 has registered voters at the hospital. This year, in explicit reliance on the Special Counsel's advice, the Veterans Administration has denied the union permission to conduct its registration drive. See AFGE J.A. at 22-23.
 
 
 56
 The Veterans Administration can hardly be faulted for its decision. Contrary to the majority's suggestion, see maj. op. at 756-757, drives of the sort proposed by Local 3511 were precisely the subject of the Special Counsel's opinion. The appellant unions expressly informed the Special Counsel that their registration drives would be conducted through their locals and chapters, and the categorical language of the advisory opinion makes clear that the Special Counsel deemed the organizational structure of the drives entirely irrelevant.
 
 
 57
 The court today refuses to second-guess the constitutional wisdom of the Special Counsel, but suggests that Local 3511 may be able sue to the Veterans Administration. It is unclear why the court thinks that such a suit, but not the one presently before us, would leave intact "the authority Congress allocated to [the Merit Systems Protection Board] as tribunal of first instance" for Hatch Act enforcement matters. Maj. op. at 755. In any event, the prospects for obtaining meaningful judicial relief in this way are at best uncertain. Quite apart from the logistical difficulties posed for union litigants by the multiplicity of federal employing agencies, the MSPB--in its " 'accustomed role' of refining the law of prohibited political activities through the continual decision of cases and the coordination of the rules that emerge from them," id.--has concluded that the Special Counsel's responsibility for Hatch Act enforcement is exclusive, see Sims v. Government of the District of Columbia, 6 M.S.P.B. 652, 654 (1981).
 
 
 58
 Of course, the members of Local 3511 remain free to disregard the advisory opinion and to challenge the Special Counsel's view of the law in any subsequent enforcement action. Rights that may be exercised only by risking unemployment, however, are hollow things indeed.
 
 
 59
 The relevance of the Veterans Administration's action for today's decision is not that it renders this case or some other case justiciable; the justiciability of this case rests firmly on the threat of enforcement implicit in the Special Counsel's advisory opinion. The action's relevance is rather that it illustrates quite vividly the effective legal force of the Special Counsel's construction of the Hatch Act, which the court now refuses to allow federal employees to challenge without endangering their jobs. Because I believe that federal employees, like all citizens, ought not be required to jeopardize their livelihoods in order to vindicate their first amendment freedoms, I dissent.
 
 
 
 [1]
 An employee in an Executive agency ... may not
 * * *
 (2) take an active part in political management or in political campaigns.
 5 U.S.C. Sec. 7324(a)(2) (1982). The MSPB is charged with adjudicating Hatch Act matters. Id. Secs. 1205(a)(1), 1505. An employee held to have violated Sec. 9 of the Act "shall be removed from his position" unless the MSPB "finds by unanimous vote that the violation does not warrant removal," in which case "a penalty of not less than 30 days' suspension without pay shall be imposed." Id. Sec. 7325. But cf. infra note 8.
 
 
 [2]
 NFFE is not a party to this action
 
 
 [3]
 The named plaintiffs also included an AFGE local alleged to represent employees at a facility in Maryland and that local's president
 
 
 [4]
 The court cited French v. Devine, 547 F.Supp. 443 (D.D.C.1982), as indicating the appropriate procedural course. There, a plaintiff precisely described political activities he wished to pursue and charged that the Hatch Act unconstitutionally barred him from engaging in them. The court believed that the justiciability of his complaint depended on receipt of an opinion from the MSPB Special Counsel stating that the Hatch Act in fact forbade the proposed conduct
 
 
 [5]
 The Special Counsel additionally observed, however, that he had considered papers filed by the unions in connection with their lawsuit against him, "as well as other material in our files." NTEU J.A. 41
 
 
 [6]
 Some other relevant factors might include other political activities of the sponsoring organization, the degree to which that organization has become identified with the success or failure of a partisan political candidate, issue or party, the nexus, if any, between the decision to undertake a voter registration drive and the other political objectives of the sponsor, whether particular groups are targeted for registration on the basis of their perceived political preference and the nature of publicity circulated to targets of the drive immediately prior to or during the drive
 Id. at 45.
 
 
 [7]
 The court observed that "Congress has provided [the plaintiffs] with no mechanism for administrative review of an advisory opinion of the Special Counsel" short of "bait[ing] him into an enforcement action." American Fed'n of Gov't Employees v. O'Connor, 589 F.Supp. 1551, 1556-57 (D.D.C.1984). "Exhaustion is appropriate," the court concluded, "only when a complainant is realistically able to seek administrative relief simply by applying for it, or when the administrative process has already begun." Id. at 1557
 
 
 [8]
 See supra note 1. We note but do not decide the question whether the MSPB, in view of the first amendment rights implicated, may suspend penalties when there is a genuine issue as to the permissibility of the conduct involved
 
 
 [9]
 American Fed'n of Gov't Employees v. O'Connor, Nos. 84-5410 & 84-5414 (D.C.Cir. Sept. 7, 1984) (order granting motion to file supplemental briefs)
 
 
 [10]
 By contrast, the "advisory opinions" we reviewed in National Conservative Political Action Comm. v. Federal Election Comm'n, 626 F.2d 953 (D.C.Cir.1980) (per curiam), and in National Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689 (D.C.Cir.1971), constituted final and authoritative statements of position by the agencies to which Congress had entrusted the full task of administering and interpreting the underlying statutes
 
 
 [11]
 For an overview of the former regime, see United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 559, 93 S.Ct. 2880, 2887, 37 L.Ed.2d 796 (1973)
 
 
 [12]
 5 U.S.C. Sec. 1205(a)(1) (1982); see also id. Sec. 1505 (parallel responsibilities with regard to certain state and local government employees)
 
 
 [13]
 Section 102 of the President's Reorganization Plan of 1978, 92 Stat. 3783, reprinted in 5 U.S.C. Sec. 1101 note (1982)--which defines the new structure of the civil service to the extent that the Civil Service Reform Act of 1978 does not provide to the contrary, see Pub.L. No. 95-454, Sec. 905, 92 Stat. 1111, 1224--states: "Except as otherwise specified in this Plan, all functions vested by statute in the [CSC] ... are hereby transferred to the Director of the [OPM]." See also 5 U.S.C. Sec. 7327 (1982) (explicitly conferring authority to prescribe regulations granting Hatch Act exemptions)
 
 
 [14]
 5 U.S.C. Secs. 1206(e)(1)(A)-(B), (g)(1), 1504 (1982)
 
 
 [15]
 In French v. Devine, 547 F.Supp. 443 (D.D.C.1982)--which held justiciable an MSPB Special Counsel opinion, see supra note 4--the court seemed to assume that the MSPB and the Special Counsel regularly act in concert. See 547 F.Supp. at 446-47
 
 
 [16]
 Even when the MSPB ultimately upholds the Special Counsel's position on Hatch Act matters, the Board does not appear to regard the employee's preenforcement good-faith rejection of the Special Counsel's opinion as an "aggravating circumstance" warranting the stiffest of penalties. See Special Counsel v. Yoho, 1983 FED.MERIT SYS.REP. (LAB.REL.PRESS ) p 5136, at X-5067 (June 10, 1983)
 
 
 [17]
 But cf. Sullivan v. Division of Elections, 718 F.2d 363 (11th Cir.1983) (holding nonjusticiable a challenge to an election commission's advisory opinion and to the Florida statute authorizing it)
 
 
 [18]
 Nor does the record or case law genuinely support characterization of the Special Counsel's opinion as a justiciable "threat of enforcement." See infra pp. 756-57 & note 25
 
 
 [19]
 In Boating Indus. Ass'ns v. Marshall, 601 F.2d 1376 (9th Cir.1979), the court found nonjusticiable a challenge to an interpretation of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Secs. 901-950 (1982), issued by the Office of Workers' Compensation Programs (OWCP), an agency with power only to bring compensation cases before the Benefits Review Board. The court observed:
 Notice No. 21 is not a regulation issued under congressional mandate in assistance of the OWCP's regulatory powers. Rather, this ruling derives from the requirement that the Secretary [of Labor] provide "information and assistance" when requested.... This section should not be expanded into a congressional mandate for pre-enforcement review of any of the Act's provisions for which assistance is requested.
 Id. at 1382 n. 6. The court added that "the possibility of criminal sanctions applying does not of itself create a case or controversy." Id. at 1385.
 
 
 [20]
 The Special Counsel must choose his projects carefully, for "budgetary ... and staffing problems ... have plagued [his] Office since its inception." Developments, supra p. 753, at 1643-44
 The observation this court made some 40 years ago remains sound in a case such as the present one:
 To permit suits for declaratory judgments upon mere informal, advisory, administrative opinions might well discourage the practice of giving such opinions, with a net loss of far greater proportions to the average citizen than any possible gain which could accrue.
 Helco Prods. Co. v. McNutt, 137 F.2d 681, 684 (D.C.Cir.1943).
 
 
 [21]
 As Judge McGowan observed in another case involving the justiciability of constitutional claims under the Hatch Act:
 Enforcement by the [CSC] only after hearing may mean, in one case, that there is no adverse application of the statute to complain of, and, in the next, that the constitutional issue goes before the court on a fully developed record. It is not irrational for both Congress and court to think that the virtues of this approach in terms of the most efficient employment of judicial resources are to be weighed in the balance as against the claims even of the First Amendment.
 Dingess v. Hampton, 305 F.Supp. 169, 174 (D.D.C.1969) (three-judge court); see Golden v. Zwickler, 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969).
 
 
 [22]
 Although the concerns expressed here--preserving administrative authority and conserving judicial resources--are typically cited in aid of requiring the exhaustion of administrative remedies (a requirement the district court found inadequate to describe impediments to federal court review of the Special Counsel's opinion, see supra p. 752 & note 7), we believe that both considerations are comprehended by the "fitness for judicial decision" criterion of ripeness as well. Cf. Public Citizen Health Research Group v. Commissioner, Food & Drug Admin., 740 F.2d 21, 30 (D.C.Cir.1984) ("ripeness" and "finality" doctrines "tend to converge in that both are meant to prevent premature judicial intervention in the administrative process")
 
 
 [23]
 Whether the opinion constitutes "final agency action" under Sec. 10 of the Administrative Procedure Act, 5 U.S.C. Sec. 704 (1982), we need not decide. We note, however, that it is difficult to regard an advisory opinion reflected upon, researched, and written on four days' notice--at the behest of parties who held the Special Counsel's feet to the fire of litigation while providing him with few facts--as a product of the agency's considered judgment
 
 
 [24]
 The facts may be "hypothetical," see Automatic Laundry, 443 F.2d at 692, provided that they are sufficiently numerous to furnish a concrete setting for review (and sufficiently typical to make that review worthwhile)
 
 
 [25]
 On the contrary, the Special Counsel's reservation of his right not to rush to judgment about a broad category of cases, but instead to consider in every instance a number of "relevant factors," see supra note 6, underscores the indefiniteness of this dispute, despite the presence of categorical language in the concluding portion of the advisory letter. The letter advice does not, by its terms, disclose the Special Counsel's intentions about enforcement; and the list of "other relevant factors" affords the Special Counsel enough flexibility to ensure that the very human tendency to stand by one's publicly expressed opinions would not dictate proceedings against participants in particular voter registration drives
 
 
 [26]
 NTEU contends that the Special Counsel should have declined to rule or requested more facts if he believed that he was short on meaningful information. NTEU Brief at 30. But the unions themselves effectively foreclosed these options by pressuring the Special Counsel to render an opinion "within the week." See NTEU J.A. 36
 
 
 [27]
 AFGE J.A. 22-23. AFGE brought the letters to the district court's attention on March 30, 1984. See id. at 2
 
 
 [28]
 There is no indication in the record that any local requested the Special Counsel's advice about that local's particular situation
 
 
 [29]
 See Wash.Post, Apr. 17, 1984, at A19, col. 4 (quoting statement of K. William O'Connor, MSPB Special Counsel, that his office "stress[es] education, rather than prosecution")
 
 
 [30]
 The district court commented that if the generality of the advice generated hardship, the problem was in large part one of the unions' making, for the Special Counsel
 could tailor his opinion only as narrowly as plaintiffs' request would allow.... [H]e was given few facts and was not advised of others ... which might have permitted a narrower ruling.... Should [plaintiffs] desire clarification, they are free to supply the Special Counsel with more information and ask him to elaborate.
 O'Connor, 589 F.Supp. at 1563.
 
 
 [31]
 And if the OPM is unresponsive, the unions may ask Congress to act. See Wash.Post, Oct. 5, 1984, at A21, col. 1 (Senate resolution instructing OPM Director that nonpartisan voter registration drives do not violate Sec. 2(6) of the Intergovernmental Personnel Act of 1970, 42 U.S.C. Sec. 4701(6) (1982))
 
 
 [32]
 This disposition dispels whatever incremental chilling effect the existence of a district court decision upholding the Special Counsel's opinion on the merits may have