# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 15, 2009   Decided March 2, 2010

No. 08-5526

UNITY08,
APPELLANT

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-00053-RWR)

*Alexandra A.E. Shapiro* argued the cause for appellant. With her on the briefs were *Marc E. Isserles* and *J. Scott Ballenger*.

*Adav Noti*, Attorney, Federal Election Commission, argued the cause for appellee. With him on the brief was *David B. Kolker*, Associate General Counsel.

*Donald J. Simon*, *J. Gerald Hebert*, and *Fred Wertheimer* were on the brief for *amici curiae* Campaign Legal Center and Democracy 21 in support of appellee and urging affirmance.

Before: GINSBURG and HENDERSON, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Unity08 is a kind of would-be post-partisan political party, aiming to mobilize what it believes to be a vital and viable center in American politics. Its plan has been to facilitate an online nominating process to choose a mixed ticket of one Republican and one Democrat for president and vice president of the United States. Until completion of that process, its only political activity (other than playing this web-based facilitation role) would be to seek state ballot access as a party.

Unity08 requested an advisory opinion from the Federal Election Commission on the question of whether it would be required to register as a political committee before selecting candidates. It argued that an organization would not be subject to regulation as a political committee if it did not seek to influence the election of "a particular *identified* candidate." Since Unity08 was planning to conduct its fundraising and other major activities before identifying a particular candidate, it argued that it should not be treated as a political committee for those activities.

The Commission rejected Unity08's suggestion, however, reasoning that under the Commission's precedent "expenses incurred in gathering signatures to qualify for a ballot for Federal office are expenditures" subject to regulation under the Federal Election Campaign Act of 1971, 2 U.S.C. §§ 431-457 ("FECA" or the "Act"). See Letter from David M. Mason, Vice Chairman, Federal Election Commission, to John J. Duffy, Esq., Steptoe & Johnson LLP (Oct. 10, 2006), A.O. 2006-20, 2006 WL 2987615, at *3; see also 2 U.S.C. § 431(4) ("The term 'political committee' means . . . any

committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year . . . ."); *id.* § 431(9)(A)(i) (defining expenditure to include any purchase "made by any person for the purpose of influencing any election for Federal office"). The Commission also found that Unity08 was an "organization[] . . . the major purpose of which is the nomination or election of a candidate," citing the words of the gloss that *Buckley v. Valeo*, 424 U.S. 1, 79 (1976), put on the Act's definition of a political committee in the interest of partially saving the statute's constitutionality.

Unity08 brought suit in the district court under the Administrative Procedure Act, seeking to challenge the advisory opinion. The district court held that the matter was reviewable but granted summary judgment in favor of the Commission, finding that the applicable precedent did not foreclose the FEC's position. This appeal followed. We agree as to jurisdiction but find for plaintiff on the merits.

\* \* \*

At the outset, the Commission objects that the case is unreviewable—on the theories that it is moot because Unity08 has ceased activity; that the Administrative Procedure Act does not authorize review because the opinion is not "final agency action"; and that the Federal Election Campaign Act precludes direct judicial review of Commission advisory opinions.

The Commission rests its mootness claim on a contention that Unity08 has "disclaimed any intention of participating in any election other than the 2008 presidential race" and

"disavowed any desire to become a permanent political party." Appellee's Br. at 15. The general principle of course is sound. A case may become moot if the party challenging the legality of government restrictions on the party's conduct voluntarily forswears any intent to engage in the conduct the government has prohibited. See, e.g., *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283 (2001).

But in this case Unity08 continues to seek to operate—and to engage in fundraising operations disallowed by the Commission's advisory opinion—if it wins this appeal. The chairman of Unity08 filed a sworn declaration unambiguously stating a conditional intent to resume activities in a future election cycle if the group wins its lawsuit against the Commission. See Decl. Peter Ackerman 1 ("If Unity08 is successful in this litigation, Unity08 has a clear and definite intent to resume its activities—renamed 'Unity12'—for the 2012 presidential election. The 'Unity' mission remains as critical today for the 2012 presidential election as it was in 2006 for the 2008 presidential election."). Even the website post that the Commission relied on for its claim that Unity08 has suspended activities blamed the Commission's ruling at issue here for "forc[ing] [Unity08] to scale back—not cease—[its] operations" and reiterated that the group is "not closing [its] doors . . . if (when) [it] win[s] [its] case" in court. See FEC's Motion to Supplement Record, Exhibit at 2-3. Unity08's uncontroverted intention to operate in the future in ways that would violate the Commission's advisory opinion keeps the controversy alive.

The Commission next argues that the Administrative Procedure Act does not permit judicial review of the challenged advisory opinion in this case, because that opinion is not "final agency action," see 5 U.S.C. § 704, and that, even

if it were, the Federal Election Campaign Act "preclude[s] judicial review," *id.* § 701(a)(1).

The Commission concedes that "the issuance of an advisory opinion marks the conclusion of FECA's advisory opinion process" and that the Commission's refusal to issue a favorable advisory opinion therefore deprives the organization that requested it of a legal reliance defense which it could otherwise receive under 2 U.S.C. § 437f(c). See *FEC v. Nat'l Rifle Ass'n of Am.*, 254 F.3d 173, 185 (D.C. Cir. 2001) ("[A]dvisory opinions have binding legal effect on the Commission."); Appellee's Br. at 23. But the Commission argues a lack of finality because a negative advisory opinion "makes no final determination of any 'rights or obligations' [and does not] change[] any legal relationships." *Id.* at 24. In the Commission's view, judicial review of the Commission's legal advice is not available unless and until Unity08 acts in a manner inconsistent with the advice and the Commission elects to file an enforcement action against Unity08 in district court.

Administrative orders are final when "they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process." *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 113 (1948)); see also *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997); *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").

The fact that the advisory opinion procedure is complete and deprives the plaintiff of a legal right—2 U.S.C.

§ 437f(c)'s reliance defense, which it would enjoy if it had obtained a favorable resolution in the advisory opinion process—"denies a right with consequences sufficient to warrant review." *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 589 n.8 (D.C. Cir. 1971). As we have previously noted, agency advisory opinions are final agency action where they "constitute[] final and authoritative statements of position by the agencies to which Congress ha[s] entrusted the full task of administering and interpreting the underlying statutes." *Am. Federation of Gov't Employees, AFL-CIO v. O'Connor*, 747 F.2d 748, 753 n.10 (D.C. Cir. 1984) (opinion for the court of then-Judge Ruth B. Ginsburg) (citing *Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953 (D.C. Cir. 1980) (per curiam); *Nat'l Automatic Laundry & Cleaning Council v. Schultz*, 443 F.2d 689 (D.C. Cir. 1971)). Moreover, contrary to the Commission's notion, parties are commonly not required to violate an agency's legal position and risk an enforcement proceeding before they may seek judicial review. See, e.g., *Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461, 483 (2004) (holding that the finality requirement in a statute governing the Environmental Protection Agency was satisfied in a preenforcement challenge where the "EPA had spoken its 'last word'" on the legal issue in dispute and the regulated party "would risk civil and criminal penalties if it defied" the EPA's directive (internal quotation marks omitted)). Our reluctance to require parties to subject themselves to enforcement proceedings to challenge agency positions is of course at its peak where, as here, First Amendment rights are implicated and arguably chilled by a "credible threat of prosecution." *Chamber of Commerce of U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995); see also 2 U.S.C. § 437g(d) (imposing criminal penalties for "knowing and willful" violations of the Act).

Although the Commission pitched this argument as a problem of "finality," the Commission's objection to preenforcement review may resonate more in ripeness doctrine than in finality. "Finality, ripeness, and exhaustion of administrative remedies are related, overlapping doctrines that are analytically . . . distinct." *John Doe, Inc. v. Drug Enforcement Admin.*, 484 F.3d 561, 567 (D.C. Cir. 2007). Ordinarily, a claim that a challenge to an agency's final legal position must await an enforcement proceeding is analyzed under the ripeness doctrine's requirements that issues be fit for review and (in some cases) that deferral of review would pose significant hardship on the complaining party.

We take it that the Commission did not make a ripeness argument because such an argument appears foreclosed by precedent in this circuit. See *Nat'l Conservative Political Action Comm.*, 626 F.2d at 958 (holding that, where "the Commission passed upon the legality of a concrete solicitation proposed in some detail by" a political party, a third party's challenge to the advisory opinion was ripe for judicial review); see also *Chamber of Commerce of U.S.*, 69 F.3d at 604 (rejecting the Commission's argument that its regulation and its refusal to issue a favorable advisory opinion to plaintiffs were unripe where "[t]he issue presented is a relatively pure legal one that subsequent enforcement proceedings will not elucidate"). Although not every unfavorable advisory opinion issued by the Commission will necessarily give the party who requested it a ripe claim, there is little to distinguish this case from *National Conservative Political Action Committee*. As there, a specific organization has sought advice on the legal consequences of pursuing a detailed, concrete course of action, and its only other route for seeking judicial review of the unfavorable advice would be to

disregard the Commission's opinion and risk enforcement penalties.

The Commission finally claims that the FECA implicitly precludes direct judicial review of Commission advisory opinions, since the Act contains detailed procedural provisions but fails to provide any private right of action against the Commission except in two circumstances not implicated here. See 2 U.S.C. § 437g(a)(8) (permitting suits by individuals who have complained to the Commission about violations of the Act on which the Commission has failed to act); *id.* § 437g(a)(4)(C)(iii) (permitting judicial review by individuals whom the Commission has found committed a violation of the Act).

We do not find this contention persuasive. In asserting such a negative pregnant the Commission encounters the general presumption in favor of reviewability, see *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967), a presumption at its "apogee" where the complainant raises "a credible claim that the agency action violates [its] constitutional rights," Richard J. Pierce, Jr., Administrative Law Treatise § 17.9, at 1315 (4th ed. 2002). The absence of any "explicit statutory authority" purporting to preclude judicial review does not foreclose the Commission's preclusion claim, but it does cut against it. Cf. *Abbott Laboratories*, 387 U.S. at 141. Moreover, the Supreme Court rejected in *Abbott Laboratories* itself the government's argument "that because the statute includes a specific procedure for [pre-enforcement] review of certain enumerated kinds of regulations, not encompassing those of the kind involved here, other types were necessarily meant to be excluded from any pre-enforcement review." *Id.* (footnote call number omitted). That Congress provided for review in

circumstances that may have seemed either exceptionally compelling or at risk of being brushed off is feeble support for precluding review in a case where standard principles allow it.

The Commission tries to beef up its claim of implicit preclusion by pointing out that Congress set out rather detailed procedures as a predicate to the two types of decisions marked for review. See 2 U.S.C. § 437g(a); Appellee's Br. at 21. As was true with the specific provision for review of such determinations, we see the procedures as indicating no more than special sensitivity with respect to these two types of decisions. It seems to us utterly improbable that Congress's imposition of some procedural rules for investigations should, with little else, be read as an intention to implicitly preclude judicial review, particularly in contexts implicating First Amendment values. Given "the context of the entire legislative scheme," *Abbott Laboratories*, 387 U.S. at 141, we find no congressional intention to foreclose judicial review.

\* \* \*

Unity08 challenges the reasonableness of the Commission's ruling that it is subject to regulation as a political committee, principally in light of our decision in *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380 (D.C. Cir. 1981), which held that only organizations supporting or opposing a "clearly identified candidate" may be regulated as political committees. Unity08 argues that because its principal operations would be conducted prior to selecting a presidential candidate it would never be in the position of supporting or opposing a "clearly identified

candidate," and therefore should enjoy the protection from regulation recognized in *Machinists*.

To make the limits of the issue clear, we note that in a letter sent to the Commission to supplement its advisory opinion request, Unity08 mentioned "plans to help the nominated candidate gain ballot access in those states that did not allow it to qualify as a party." J.A. 199. But it added in the next sentence that after nomination it would "file another Advisory Opinion Request." *Id.* In *this* FEC proceeding, then, it sought no advice on the issue of post-selection assistance to its nominees, and indeed the Commission's response never alluded to such possible activities. Thus the question before us is whether a group that seeks to select (or "draft") candidates, but which has never supported a clearly identified candidate in the past and does not have any fixed intention of supporting the selected candidates, can avoid regulation as a political committee under *Machinists*.

In *Machinists* the Commission had sought to enforce a subpoena it had issued to a registered multi-candidate political committee that was "encouraging and assisting the formation of 'draft-Kennedy' groups in several states . . . engaged in promoting the acceptance of presidential candidacy by Senator Edward Kennedy." 655 F.2d at 383. Rejecting the Commission's effort, we held "that the Commission lacks subject matter jurisdiction over the draft group activities" at issue. *Id.* at 384-85. In our view, "construing the term 'political committee' to include groups whose activities are not under the control of a 'candidate,' or directly related to promoting or defeating a clearly identified 'candidate' for federal office" created "grave constitutional difficulties." *Id.* at 393. In the absence of any indication in the legislative history of FECA that Congress intended to regulate "draft"

groups as political committees and in light of "*Buckley*'s judicial gloss limiting the definition of 'political committees' which could constitutionally be regulated," we concluded that draft groups were outside the scope of the Act. *Id.* at 395-96 (citing *Buckley*, 424 U.S. 1).

While we recognized that the statute on its face "seem[ed] to include as political committees . . . 'draft candidate' groups," *id.* at 391, we thought it clear that the Supreme Court's *Buckley* decision had limited the definition of "political committee" in order to avoid the constitutional problems that a broader definition would present. *Id.* at 392 (internal quotation marks omitted) (quoting *Buckley*, 424 U.S. at 12-28). *Buckley* does not on its face discuss the application of FECA to "draft" groups but it consciously narrowed the statutory definition of "political committees," holding that the statute "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." 424 U.S. at 79. The Commission argues that *Buckley*'s "major purpose" test, properly understood, encompasses groups such as Unity08 that intend to nominate or elect a candidate, whether or not the group has already "clearly identified" the candidate. But *Machinists*' reading of *Buckley* as limited to groups who have a "clearly identified" candidate was essential to its outcome in *Machinists* and is therefore binding on us. See *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) ("One three-judge panel . . . does not have the authority to overrule another three-judge panel of the court.").

It seems hard for the Commission to argue that Unity08's contemplated activities would constitute support or opposition of a "clearly identified candidate" more than did the "draft Kennedy" groups at issue in *Machinists*. Those groups, after

all, had the purpose of building a draft movement for a particular, named individual to run for a specific office in a specific election cycle. Unity08, by contrast, seeks to organize voters online based on common views and to coordinate a selection process that will culminate in the identification of a particular, named individual—but only at the very end of the process.

To avoid this conclusion, the Commission argues that *Machinists* should be read as resting on a distinction between groups that seek to encourage someone to become a *candidate* and groups that are organized for the purpose of actually *nominating* or *electing* that individual. In the Commission's view, the raison d'être of the draft groups in *Machinists* was merely to get someone to enter the race—*not* for that individual to be nominated on any particular ticket or to win the race. This reading attributes to the *Machinists* panel a strange disaggregation of the aims of draft groups; surely the panel understood that a group organized for the purpose of drafting Kennedy wanted *at least* to help bring about Kennedy's nomination.

The Commission also contends that allowing a group such as Unity08 to avoid regulation as a political committee creates the kind of opportunity for corruption that the Supreme Court recognized in *Buckley* as sufficient to justify the abridgement of First Amendment rights that FECA regulation entails. But the Commission fails to explain why the opportunity for corruption is any greater in this case than it was in *Machinists*. Indeed, if anything, the opportunity for corruption appears to be lesser here: whereas the groups in *Machinists* almost certainly were providing assistance of some kind to Senator Kennedy by increasing his name recognition and support, Unity08's proposed method of generating

nominees was such that neither donors nor candidates would know at the time of the donations which candidate would ultimately benefit from the group's convention. This would appear to significantly lessen the likelihood of a "quid pro quo" of the kind that *Buckley* supposed might undermine the integrity of our political process. *See* 424 U.S. at 26.

Of course under Unity08's plans, potential donors can anticipate that in due course nominees will emerge and be able to benefit from the ballot access that Unity08 will have by then secured. The nominees might feel grateful or even beholden toward donors who effectively conferred such ballot access. However true that may be, it is hard to see how this sense of gratitude or obligation would be stronger than that of Senator Kennedy under the facts of *Machinists*.

The Commission's advisory opinion also asserted that *Machinists* "expressly left open the question of whether draft groups could be treated as political committees for purposes of the Act's contribution limits after Congress's 1979 amendments to the Act." See A.O. 2006-20, 2006 WL 2987615, at *4 n.8. The Commission's advisory opinion did not identify any aspect of the text or legislative history of the 1979 amendments that might be read to abrogate *Machinists*. And the assertion misreads *Machinists*, which left open the possibility of treating draft groups as political committees only for purposes of the disclosure requirements, not for purposes of the contribution limits. See 655 F.2d at 395 ("The writers of the House report apparently believed that 'draft' groups should be treated as political committees for some purposes, at least. But there is *no indication* from the 1979 Amendments or the legislative history that such 'draft' groups were to be bound by the contribution limitations." (emphasis

added)). In any event, the Commission evidently abandons this argument, as it nowhere mentions it in its brief.

Absent any compelling ground for distinguishing *Machinists*, we find that Unity08 is not subject to regulation as a political committee unless and until it selects a "clearly identified" candidate.

The Commission lastly argues that the reading of *Machinists* that Unity08 proposes, if accepted, would have the effect that "all political parties . . . would be constitutionally exempt from regulation as political committees in each election cycle until they had nominated their candidates for federal office." Appellee's Br. at 41. But as we noted earlier, we regard Unity08's request for an advisory opinion as presenting only the question of whether a group that has never supported a clearly identified candidate—and so far as appears will not support any candidate after the end of its "draft" process—comes within the holding of *Machinists*. By contrast, political parties previously have supported "clearly identified" candidates and almost invariably intend to support their nominees. The risk of a "quid pro quo" from donations to such parties might therefore be materially greater than the risks of corruption presented by bona fide draft groups. Hence, we need not decide whether there are any varieties of "standard" political parties to which *Machinists* might apply.

The judgment of the district court is

*Reversed.*